I want to welcome everyone to the, uh, Fourth Circuit Court of Appeals this morning. Uh, we have, uh, two cases to be argued. The, uh, first case, which I know the students had studied and found very interesting, I'm confident of that, uh, had to be postponed because of the illness of one of the, uh, of the attorneys. So, we have postponed that to further scheduling and we're going to, uh, hear the, uh, other two cases and after we complete the other two cases and adjourn court, uh, the panel will confer, uh, with respect to the arguments. And then we intend to come back in the courtroom and conduct a, uh, question and answer session with the students, the faculty members or whoever wants to, uh, attend and, uh, at that time the judges will answer some questions. But until then we're going to have the lawyers answer questions. Uh, the first case, uh, that we'll hear and let me say one other thing. Uh, Judge Thacker and I are graduates of the College of Law at West Virginia University in Morgantown. Uh, our distinguished colleague, Judge Motz is a graduate of a wonderful law school down in the, uh, Old Dominion and she should be presiding under our protocol today. Uh, but in exercising her seniority on the panel, she has ordered me to preside. And I am dutifully attempting to perform that. But, uh, the first case is, uh, John Doe versus Wallace Ho et al., number 181497, Mr. Schwartz. It's nice to have you here. Thank you for coming to Morgantown, sir. Thank you. Good morning, your honors. Good morning, assembled. Uh, may it please the court, my name is Ron Schwartz and I represent the plaintiff, John Doe. Uh, the plaintiff was a senior at the University of Maryland, almost ready to graduate when he was expelled from the university for alleged sexual misconduct. Uh, and I've alleged basically, well, the complaint alleged three grounds, equal protection, due process, and, uh, Title IX reverse discrimination. But I'm focusing on the due process and the reverse discrimination case. You're focusing on due process? On due process and the Title IX reverse discrimination count, uh, erroneous outcome claim under Title IX. Now, seems to me, and I, I've raised lots of due process arguments in my brief. So what's your strongest due process argument? So, uh, thank you, because I was just about to tell you that. My strongest due process arguments, I, I, I'm going to focus on three points. The first point is that there was a huge, the most important piece of exculpatory evidence, which was in the control and possession of the university, was not provided to my client. There was a handwritten statement that the alleged victim, Ro, wrote when she was interviewed by the police at about six in the morning. And in that handwritten statement, she described essentially a consensual sexual encounter with a person that she thought was somebody else. And... If she thought it was somebody else, how is it consensual as to your client? Well, that's the interesting... Yeah, so what's the answer to that? If you just give me one second, I will answer it. I'd rather you just answer it now. Okay, well, the answer is that there's a mistake of fact defense in this case. Okay. And it's a reason, and it's a question of consent certainly can be under the sexual misconduct policy, consent can be shown by actions. I mean, we don't need affirmative consent before something happens. So if somebody acts in a way that the person that's acting believes is consensual, and he reasonably believes that she knows that it's him, then he's acting without intent to commit any offense. And so the question is, is this a strict liability crime? I don't think it is. I mean, this is not a criminal case, but it is quasi, it's disciplinary. So it's, I would call it... You're lucky it's not a criminal case. Well, it wasn't a criminal case because the authorities believed it was not a criminal case. Well, the authorities declined prosecution. They looked at this immediately and said... Apparently, but that doesn't mean that he's not subject to expulsion by the university. I agree, and there are different standards, and the standard of proof is different. There's many different differences between the criminal... But in the criminal law, there's a defense of if you take the plaintiff's allegations as true, which you must at this stage of the complaint, then the plaintiff reasonably believed he had consent. And if it went on for 10 or 15 minutes, and there's verbal consent, he has a beard, he says they looked each other in the eye, they spoke, he had every reason to believe that there was consent. And this case turned, Your Honors, on his intent. I mean, he was expelled because the fact board, the SRC, the Standing Review Committee, found that he acted as a predator, that he went in with bad intent. But he was never given any opportunity to prove that. And the corroborating, the most important corroborating piece of evidence to his defense was withheld. And that was the statement. That letter, yeah. Where is that in the record, the letter? The letter, it's JA-345. Thank you. It's her handwritten statement, which we only obtained... What statement? It's the handwritten statement. And it was only obtained by a subpoena after this case was filed. And I would point out... Was it properly in the record? Yes, it was attached to a motion to dismiss. And it was argued below. I argued it to the court. So yes, we didn't have it when we filed the complaint, but we obtained it. It was an attachment to a motion to dismiss. And I argued it below and Judge Zinn has considered it. So it is part of the record in this case. And it was provided by the defense. I mean, the university provided it to me. It was from the university police. Oh, I'm sorry. I thought you said it was withheld. It was only given to me after I filed a subpoena after this case was filed. It was withheld at the time of the hearing. It wasn't provided to your client. It was not provided to my client. And in connection with the hearing. Correct. And you're claiming that... Absolutely. That impacts the due process issue. Absolutely. And... Can I just go to the consent? What in this do you say indicates her consent that it was your client and not KP? Well, no. I'm happy to have you refer to her. Clearly, she did not know. Well, clearly she did not know. It was my client. But... Okay, but... You can... Let's take it out of this hypothetical. And if a woman would consent to have some sort of relationship with her husband or her fiance, and some stranger came into the room and raped her, and she knew it wasn't them, just because she had consented to have the relationship with somebody doesn't mean she has consent for the world, does it? No, it doesn't. But when you have... My client had a beard, okay? KP doesn't have a beard. They knew all that at the due process hearing. Well, my client did raise that he had a beard. He argued all that. He did argue that. To the university board. He did argue that he had a beard. But what he was not able to do, your honors, what he was not able to do, they didn't believe him. And the fact that the victim herself said... We don't re-weigh credibility issues. Well, there was no opportunity to assess credibility in this case. And that's part of the problem. I mean, we have two statements... Did the victim testify? Never. She never appeared. The only time the victim ever had to do anything in this case was have an interview with the investigator the day after the event. And the two statements, the statement she gave to the police and the statement in her own hand, which was not provided, and the statement that she gave to the investigator couldn't be more different. Where in the record is the statement that you say is different than the letter? It's the Bronson statement. It is... It's Exhibit 5 to the complaint, and it starts at J.A. 152, I think. 152, 153, 154, through 157. And that's easier to read. So what is the key difference between the statement in the police report and her handwritten statement? Well, her handwritten statement says the sexual activity went on for 10 to 15 minutes. In the statement of Bronson, it's 3 to 5. It's a big difference. Something's happening for 10 or 15 minutes. You know, when does a person reasonably believe he has consent? 10 to 15 minutes is a long time. 3 to 5 is much quicker. In the statement for Bronson, she said she drank a lot more. She said she drank a half a liter of wine. There's a question whether she was intoxicated or not. That is strongly contested in this case. In the statement with Bronson, she talks about a lot more drinking than she says to the police. In the statement to Bronson, she says that essentially he forced himself upon her and she just went along. The statement to the police is a very different statement. It's a statement of she thought it was her friend. She's describing essentially a consensual act that then when she realized it wasn't the right person, she says, you're not KP. He's immediately shocked. He's surprised that she doesn't know. That's the important exculpatory piece. And he immediately stops. He says, I'm sorry. Do you want me to get KP? I'll leave the room. So this is not a person that is acting. He believes that she knows with whom she's acting. And intent matters. And this case turned on intent. Did you represent this person before the university? I did not. He was unrepresented before the university. Could he have had representation? Could he have had representation? Yes. The cost of representation is basically prohibited for most colleges.  Let me say what he was told. Is the answer to that correct? He was advised he could get his lawyer. He was never advised until six days before this. Now, there was a statement of rights. Six days before what? Six days before the hearing, he asked for a continuance. Because the time between the charge and the hearing was six days. When was he advised he could have his lawyer? The original notice says you have a right to a lawyer. So I would say right in the beginning. That was early on. That was early on. Correct. Correct. But in fairness, he was advised he could have a lawyer. He was advised he could have a lawyer. He didn't get a lawyer. No, he didn't. He didn't tell his parents. A lot of these kids don't tell their parents. They don't understand the significance of it. I'd like to do something about that. Oh, he did understand the significance. And that's why he didn't tell his parents. Well, I think he didn't understand. No, what I would say to your honors is that he was under a pretty large misapprehension that because he was not charged criminally, he wasn't going to be in trouble. I think he really didn't understand the significance of it until the charge came down six days before the hearing. And then he's scrambling. And then he says to the director of student conduct, I want to get a lawyer. Can I have a postponement? We're in the middle of final exams. He says, I need a postponement. And that was in May? That was in May. May 6th. Was that in the middle of final week? If it wasn't the middle, it was a couple of days before final week. And he was a senior? He was a senior. Correct. Was he going to graduate that semester? He had a few credits shy. He would have had to come back for, I think, four or six credits. So he was not a graduating senior. Would he have graduated in the summer? He would have graduated in the summer or the next fall. He was a couple of credits short. He wouldn't have graduated. It wouldn't have been the final thing. He would have been a few credits short. But he said, I'm going to be in final week. And I'd like to have a continue. Correct. Six days. And they denied the continue. They denied the continue. What was the reason for the denial? There was no reason for the denial. The reason says there's no procedure for a continuance. That was the answer. How do we review that in the context of this case? Well, because... How do we review it? What's our standard for review of the denial of the continuance? Well, so it is one... What's the standard of review? The standard review is whether or not, taken as a whole, there was a denial due process. Due process looks at the gestalt of the proceeding. Not one particular thing. So I don't think you need to make a rule that says you're entitled to continuance in a student misconduct case. So are you saying the standard of review is totality of the circumstances? I would say that Matthews v. Eldridge and all the due process cases say there's a flexible standard of due process that you look at the case, you look at the matter as a whole, and you say, was a fair hearing given here? No, but on a denial of a continuance, if it was in a district court that came up here, it would be abuse of discretion. Correct. The abuse of discretion, the courts, the district judges or the trial judges have discretion on whether to grant continuances. Does that not have anything to do with this? I agree, it has nothing to do with it. It does not have anything to do with it. No, I don't. This is not a case where it's a question of a trial judge... So we don't review that for a discretion? I don't think you review that for abuse of discretion. You look at the entire process and say, was it fair? It seems to me, and I don't want to give up my Title IX case because I have two minutes left here, but the standard of proof, Judge Zinn has said that if I had statistics, that that might be a different story. I say that that's an unreasonable burden. There are cases that say that Iqbal and Twombly don't make you have to make a prima facie case at the pleading stage. If this was a private school and I had a reverse discrimination case, I wouldn't be able to do a freedom of information request to get the statistics. These numbers are in the control of the university. My allegation... This thing's up here on summary judgment? It's up here on a denial of a motion to dismiss under 12B6. It's under 12B6. Correct. So you claim that we got to give you the facts? Absolutely, that I have at least some process of limited discovery. There's a great law review article that I found on this after the briefs were written. It's 85 Fordham Law Review 2665. It reviews all the cases under Title IX and the standard of pleading under Iqbal and Twombly. I commend that to you. It's a great article and it reviews the entire compendium and it says that you need to get at least limited discovery at the pleading stage to get through that. But let me get back to the final due process argument in this case. Due process is for everybody. I mean, it well may be that if on a remand and my client gets some opportunity to test the credibility, which this case turned on. I mean, his intent mattered. And even if he was found guilty of a violation, he was expelled. So it doesn't just go to the violation itself, but also to the sanction. He was never able to test her allegations. He was never able to bring witnesses because he was convicted by a police report in this case. And the university will say, well, the rules talk about witnesses. They don't say that the respondent can bring witnesses. So is it your position that he couldn't have brought the witnesses? That is my position, that the procedures did not provide... Does he... Is there something in the record which he says that he was told he could not bring witnesses? I will tell you there is something in the record. My client asked... My client was provided with the wrong procedures. I understand that. And those procedures provided for a subpoena for witnesses to be issued by the director of student conduct. This was on May 5th or May 6th. My client wrote the director of student conduct the next day and said, I want the policemen to come to my hearing next week. I want a continuance, but I want to be able to subpoena the police officers. And the director of student conduct wrote back to him, read the rules. And the rules don't provide for bringing witnesses. They talk obliquely that... So if we send this back, you're not going to bring any witnesses? I would, I would... You just said the rules... Well, the rules don't provide for it. And I think that you need to send it back and say, you do need to bring witnesses. That's an essential element of due process. I can't believe... Could he have brought affidavits from these witnesses? Well, he brought statements and they were not... They essentially... He brought three statements that said... I'm asking if it's an affidavit, it's under oath? They're not under oath. They're not affidavits. They're not affidavits, they're just statements. But the rules of evidence don't apply in this case. The rules of evidence... They don't have to apply... They don't have to be under oath, but... They don't have to apply. The point of the matter is that the board compared a cold record of a police report with statements that my client got at the last minute and said, no, I never was contacted by the investigator. No, she wasn't drunk. I mean, they refuted some of the important facts, but they gave it no credibility. And they said in their decision, we're not giving them any credibility, but credibility needs to be determined. You need to bring witnesses to assess that credibility. Again, if we take it away from this particular case and you have witnesses, for example, say you have a traffic accident and you have three witnesses that saw you 10 minutes before, they aren't operative to helpful to what actually happened about who ran the red light, are they? No, they're witnesses. But in this case... But they're not witnesses to the operative important facts. But in this case, they were witnesses to the intent. The intent is... Well, how could they be witnesses to intent? Because they said that my client entered this room on a dare. That's what they... That's what... That's not what they said. They were playing a trick on us. That's what the police said, they said. They recanted that testimony. They said that's not what they told the police, but that's in the police report. And the investigator says, when my client raised the fact that they never talked to them, the investigator says at the hearing, well, there is the police report. And it's our belief that he didn't want to talk to them because he felt that he had what he needed. He had... I mean, what we have done in this case is we have combined the evidence gathering, the relevance gathering, the prosecutorial function in one person of an investigator that then... And who trains the panel. Who trains the panel that here's the case. And so you can't... That to me is a denial of due process to combine those functions. Either he's a prosecutor or he's an arbiter of evidence. Do you know what that red light means? Yes, I understand, Your Honor. I think I'm out of time. Thank you. Thank you. You've reserved some time. I've reserved five minutes. Thank you. Mr. Lord. Good to have you here, Mr. Lord. Thank you very much. Good morning. May it please the court. My name is Christopher Lord. I'm an assistant attorney general representing the University of Maryland and the individual university officials who have been sued individually and in their official capacities in this case. Mr. Schwartz has stated in his argument multiple times that this case hinged on Mr. Doe's intent in entering the room. In this case... It sounds to me like he's just saying it was a practical joke that went bad. Well... He's not saying? That's what Mr. Doe originally said and that is what his friends originally said. And now Mr. Doe went to the hearing and denied it and asked his friends to sign statements that said Mr. Doe wasn't aware that we were daring him. The witnesses... What difference does the dare make? Well, this is why it's important and this goes right to due process, Your Honor. In this case, the SRC, the Standing Review Committee, heard the evidence from the report and decided... It did not decide whether or not Jane... But it didn't really hear the evidence from the report because there weren't witnesses there. For example, why would he not have the opportunity to cross-examine the victim? Well, in this case, the cross-examination would not have done anything and here's why. The SRC did not decide the case on the basis that Mr. Schwartz is now arguing. It was not a question of whether or not Jane Roe consented to engage in sexual activity with KP, the person whose bed she was sleeping in, whom she had gone to bed with. KP got out of bed. Doe slips into bed. There's a question of his intent and why he did that. But it is undisputed that they engaged in sexual activity and that she, in fact, did not know she was in bed with Doe. The university... Well, the police report says that all sex acts were consensual. Well, please... What are we to do with that? No, no, no. The police report said... I'm looking right at it. The police report concluded that she... The police said there's... The evidence was that she was willing to engage in sexual activity with KP, not with Doe. And in fact, in her own handwritten statement, which Mr. Schwartz now says should have been produced to him because it's exculpatory, and I'm referring to JA-347... Well, wasn't it produced? The investigator didn't have it. This was part of the University of Maryland Police Department criminal file. They produced the report to the Title IX office. But it is exculpatory. It's not exculpatory, and here's why. The SRC did not decide the case on whether or not the act was consensual, the sexual activity was consensual. The university decided there was a policy violation because she did not consent to have sex with Doe. So in other words, she is having sexual activity with somebody she doesn't know. It's a dark room. She's gone to bed. She thinks she's in bed with KP. She wakes up and she's engaged in intimate sexual contact with somebody named Doe, who she's not even aware she's in bed with. That fact is undisputed. Now, the police... The dispute... Well, that's your best case. I'm not quite sure that's right, because remember there's the... At least what your colleague on the other side said is that she did know that it was not KP. Oh, no, no. Mr. Schwartz, I'm sure he will... Because the beard of the... I'm sure Mr. Schwartz will clarify that. He has never alleged that she in fact knew she was in bed with Mr. Doe. Well, he said one of them had a beard. This guy had a beard. Right. Doe had a beard, and the guy that got out of bed... KP did not. Right, no, no. KP didn't have a beard. Right, and so what he's... That's a big difference. Well, it's two responses. There's referred in her statement to kissing. You're correct, Your Honor. Her first statement, the one that you all hid in his view, refers to kissing. Your Honor, there... You can tell the difference if you're kissing somebody, whether they were clean shaven or had a beard. Well, there are two responses. First, I want to make sure the record is crystal clear. He, Mr. Schwartz, is not alleging and has never alleged in this case that Doe... Mr. Schwartz has just got in the case. He wasn't in it back there when you all... Well, fine, fine. Mr. Doe... All he had was a bunch of hearsay. Mr. Doe has never... With no witnesses. That's not accurate, Your Honor. Okay, so Doe isn't alleging. Finish your sentence. Thank you, Your Honor. Mr. Doe is not alleging that Roe actually knew she was in bed with KP, with Doe. She knew she was in bed with KP. She thought she was in bed with KP. She thought she was in bed with KP. And she wasn't in bed with KP. But she ultimately knew she wasn't, because that's what the whole is happened. Exactly, and as soon as she came awake and realized she was in bed with Doe and not KP, she exclaimed, you're not KP, get out. He doesn't dispute that. He does not allege. It is... He writes in his reply brief. It is uncontested that this was a case of mistaken identity. Can you respond to his due process arguments? The fact that he wasn't allowed to have... Apparently wasn't allowed to have witnesses or cross-examine the victim and that this written statement came too late? Yes, Your Honor. Thank you. First, the SRC, it's important in a due process hearing to analyze what the decision of the university was. What does SRC stand for? The Standing Review Committee. What? The Standing Review Committee. Standing Review Committee. Right. So they're the ones that are making the decision on whether or not to throw him out of school. They're the ones who made a recommendation. They made the factual determination and a sanctioned recommendation that he be expelled. And who made the decision, the president of the university? Ultimately, in this case, it was at that time... The Standing Review Committee is the main body that had this proceeding. Yes. That where they denied the continuance in the middle of final week. Yes. But after four months of this process going on... They gave notice, what, how many? Six days before the hearing? You understand, Mr. Doe was... They gave him notice six days before the hearing. Yes or no? Yes. They gave him six days and they scheduled the hearing in the middle of final week. I don't know whether it was final week that week or whether he was finishing... Well, it was in early May. It was in mid-May and he was invited to come... It smells to the heavens that you're having a hearing on something this important in the middle of final week and you deny continuance to a senior in college. He had chosen not to come to a meeting with the Director of the Office of Student Conduct the day before. That's called an outcome hearing. So the process is... I thought you said when you were beginning to answer us, I know it's hard because the questions are coming fast and furious, but I thought you said just a second ago, this had been going on for months. It had been. Okay, so what didn't he participate in before? Was there anything that he was... Any other opportunity he had to put forth his case? Yes, he had multiple opportunities. He was advised in writing in January that the university had started a sexual misconduct policy investigation. He was told in that writing that he had rights to an advisor, to a support person, to hire an attorney. Is this the two different notices? The one wrong notice and the wrong... Okay. No, this was in January. When did that happen? So that happened on May 5th. So what happened was he's advised... May 5th? Yes, on May 5th. That's when you're sending the wrong set of rules? No, no, no. Really? That late? It came after... So in late January, he's advised in writing that there's an investigation. He's given a link to the rules, to the policies and procedures... When did you send him the wrong set of rules? Not on that date, not in early January. What date did you send him the wrong rules? On May 5th. May 5th, you sent him the wrong rules, didn't you? And it was corrected on May 7th. He had the right rules in January? He had the right rules. He had a link to the right rules. He had a link to the right rules in January. He met with the investigator in February. He met again in April to review the draft report. He was able to make comments on the draft report. He was able to give the names of his witnesses that he wanted the investigator to interview. He was able to respond to all the statements in the draft report. Did the investigator interview all his witnesses? This is the one disputed fact. The witnesses claim now, Mr. Dell alleges, that the investigator never reached out. The investigator in his report writes that he reached out to the witnesses. They didn't respond. He testified to the Standing Review Committee that he tried to reach out. And you have in the record an affidavit from the investigator, an affidavit that states that he did reach out. He called them and sent them in two emails. And you have copies of the emails. They're in the record. So can I ask you, could Mr. Doe, could he have brought witnesses to the SRC? Yes, absolutely. And what tells him that? The policy, which is Appendix A of the University of Sexual Misconduct policy. And I would refer your honor to JA 193, which describes the SRC conference procedures. And that policy. That's the right set of rules? That is the right set of rules. And was that never given to him? It was given to him. He was provided a link to it in early January. When was the wrong set of rules given to him? On May 5th, and it was corrected on May 7th. And I would submit, your honor, that in its university. Did the notice in January advise him that he could get representation? It did, your honor. And that notice is attached to the, it's in the record of JA 485 and 486. And I can just show it to you. You'll see my highlights. In a big, bold letter, role of the support person, attorney, and non-attorney advisor. This is in the very first notice he received that he was under investigation. And he knew exactly what was going on. He had been questioned by the police the morning after this incident happened. There had already been a criminal investigation. This is a case where this victim. And he knew at that point that the criminal investigation had been closed. I don't know whether he knew that at that point or not. It did not go forward. That's not in this record. I don't know whether he knew it or not. That's not in this record. I'm not aware of one. I don't think it's in the record. I don't know if there's an allegation. No, we take what's the record show. We take the facts in his favor. No, I understand that. But his favor. He gets the benefit of the facts. I understand that, Your Honor. Well, he gets the benefits of the facts. But to the extent there are documents which are integral to the complaint, they outweigh the complaint. And in this case, what I would urge you to look at, Your Honor, are the policies which you've attached to the complaint. I'm just asking you what the facts show about that right now. I mean, you don't know. I don't know whether he knew the criminal complaint had been dismissed or not. He knew that he'd been questioned the day after the incident. He knew that a month later, he received a written notice of a sexual misconduct investigation. He knew he was interviewed. He knew he was not criminally, hadn't been criminally charged. He knew that he'd not been criminally charged. I said that. We can agree on that. We can agree on that, Your Honor. On that, Your Honor. The issue, let me just go to the crux of the due process argument if I can. In this case, the issue was, as Mr. Schwartz stated repeatedly in his oral argument, the question hinged on Mr. Doe's intent. The SRC allowed Mr. Doe to testify, both to pose questions to the investigator and exchange in a heated and an extensive questioning and answering session with the members of the Standing Review Committee. He presented all of these defenses. He presented his defenses as to why he did not intend to engage in non-consensual sexual activity with Ms. Rowe. The panel, a five-member panel, of which there is no allegation of gender bias whatsoever against the five panel members, listened to his testimony. As Mr. Schwartz conceded repeatedly in his oral argument, the question in this case hinged on his intent, on Doe's intent. Rowe's intent, Jane Rowe's intent, had nothing to do with it. She is asleep in KP's bed. There's nothing she could have testified to that would have impacted on John Doe's intent. The only person who knew John Doe's intent was John Doe. The SRC testified in, excuse me, John Toe testified in person to the SRC Commission. He tried to explain why he did not go in on a dare. He tried to explain why he thought she should have known it was him. The SRC is the panel that made the factual findings. Having heard his- So he couldn't bring those witnesses in? He could bring those witnesses in. I'm not sure if I answered your question before. No, and I have the language I have here, and I don't know that it's exactly as clear as one might want, but it does talk about witnesses. And not only that- SRC will meet with available witnesses. Is there an ability for someone in front of the SRC to subpoena witnesses? It doesn't sound like that. Nor is there any allegation in this clip. Mr. Doe has never alleged that he attempted to bring the witnesses, and he was rebuffed. The only allegation is that he asked a question about it in an email, and there was no response. But he was able to produce witness statements- I thought, and correct me if I'm wrong, and you surely have a better grasp of the facts, but I thought that he had understood from one of the emails the misinformation that they would subpoena witnesses, that they would bring witnesses in. Is that wrong? No, I don't think that's accurate. I think what he's arguing now is that he had asked a question about witnesses and didn't get a satisfactory answer. But he never requested that his roommates be able to come and testify in person. Not only do the procedures allow- But he brought statements from them. He brought statements. Not sworn statements, but statements. Signed statements, which the SRC accepted into evidence, considered, reviewed that against the other evidence in the record, including Doe's own testimony as to Doe's intent, and found him to be not credible. That is exactly the type of due process hearing which should be, which is sufficient under the Constitution. He had a full and fair opportunity to know what the charges were against him, to know what the evidence was against him, to respond to it at the investigation stage, and then to present a thorough argument to the SRC itself, including- Did they specify which facts he testified to that were not credited? Yes, Your Honor, and I think this- I explained why he was not credible on those facts. Yes, he did, Your Honor. And where is that? It is at JA 567, is the notice- 567? 567. That is the notice of the SRC outcome. And this is, it is critical that the panel, I would suggest, read the SRC decision. Because the SRC decision is based on two primary findings. The first is that while masquerading as- And this is the finding, I'm quoting. While masquerading as KP, Doe made no reasonable attempt to identify himself to Roe, who had no reason to believe the person who began touching her was not the person she went to bed with. Similarly, the SRC concludes, quote, all sexual acts that occurred between Doe and Roe were without Roe's consent in the view of the SRC, as she was unaware that it was Doe she was performing these acts with and not KP. The SRC specifically found that there was a policy violation based on the fact that she did not know she was in bed and engaging in sexual activity with Doe. She did not consent. The SRC, the policy- Moreover, the SRC also considered Doe's statement as to his intent and whether or not he intended to go into this room on a dare or whether it was an innocent, he just went into the room to go to sleep, which he now claims. And having heard his own testimony as to his intent, they specifically find him not credible. And they use- The SRC uses that word. So having had a full and fair opportunity to present his own testimony as to his intent, the SRC simply did not believe him. That this court case today does not hinge on whether or not there's sufficient evidence to support that factual finding, although I would submit there clearly was. This case is a question of due process. Was he entitled? Did he have an opportunity to understand the charges against him, to respond, to know what the witnesses were saying, and to present his side of the story? That is what the Fourth Circuit has held. Those are the elements of due process that this court has held are required in student misconduct cases. All those elements were satisfied in this case. So I have gathered from the papers that he was relying pretty heavily on the fact that he'd gotten incorrect information from the university and later correct it. And I just want to be sure, I had thought they both happened back in the day. And you're telling me the correct information, or at least a link to it, as I understand it, didn't get the exact policy, but got a link to it. That's correct, Your Honor. The Notice of Sexual Misconduct Investigation specifically identifies, has a link to it, and on the second page... And you're saying that was back in January. It was January, correct, Your Honor. It's on JA 485 and 486. Okay, and then when did he get the incorrect? On May 5th. Did he get the actual policy sent to him, or did he get a different link? I think the allegation is that it was an attachment to an email, that the old policy was attached. And that was a mistake. That was a university official making a simple mistake, which was corrected two days later. What happened was, he was invited to come to the outcome conference. So what happens is, there's an investigation, the Director of the Office of Student Conduct invites both parties in to say, here's what the investigator found, and here are the next steps. Is that the conference where they denied a continuance? It was in an email exchange, because he chose not... He did not come. He didn't even come to it. This person is being accused of sexually assaulting, has been accused of sexually assaulting... Now, what was the date of that one? May 5th or May 6th. He was invited on May 5th to come to a May 6th conference. Okay, and he didn't come. He didn't come. When was the... What was the conference, or the meeting that he asked for the continuance and he denied it? That was in an email exchange in that day and the following day. So, Ms. Andrew Goodwin, who's one of the... He asked for a continuance, was denied, and he didn't come. No, no. He didn't come to the... Sorry. On May 5th, he's told, we're ready for the outcome conference. You've had an opportunity to review the draft report. You've commented on it. The investigation is complete. Now, there's an outcome conference. And at that point, if there's insufficient evidence for a finding, then you'll tell the parties it's not going to go any forward, or if it's a minor violation, there might be an agreement on a punishment. If it's a major violation like this one, it will be referred to the standing review committee for a separate level of review. So, it's not the investigator making the findings. It's the five-member panel. I see my time's up. Go ahead and finish. I have a question, too. So, he declines to come. And as I mentioned to Judge Zennis below, I can represent. Ms. Goodwin tells me that is the only time in her history where a student facing expulsion declines... She tells you, or is that in his record? No, I put it on the record before the district court, so I'll tell you also. It's not in the written, in the papers. So, it's not in the record? Well, other than the transcript. It's in the transcript. That's your testimony. It's a representation to the court. So, the point is, he declines. Are we allowed to consider that? What you say, somebody told you. Probably not, no, Your Honor.  So, I'm sorry. I'm really interested in the chronology of this. Yes, thank you, Your Honor. May 5th, he's told that he can come to... The outcome conference. And he says, I'm not coming, or just doesn't show up? I can't make it. You didn't give me enough time. I can't make it. I'm not coming. Okay. So, then she sends him a letter on May 7th, and says, since you didn't come... Okay, but so on May 5th, he'd also been sent the wrong instructions? She attached to the letter. So, there's an email that's sent to him with a letter saying, the outcome conference is tomorrow on May 6th, and also attached to that were the prior policies. Right. He doesn't show on May 6th. But he responds to that? He says, I can't come. Can't come, and doesn't come. And doesn't come. And this was during the final week? I don't know the exam schedule, Your Honor. I'm sure it was around the time the finals are. I'm not going to dispute that. But it succeeded, as I understand it, this whole business started in January. Started in January. It started in December when the incident occurred. When he was getting the correct information. Right, exactly. And he's told in January, you're under investigation. Here are all your rights and responsibilities. Here are the policies that apply. Here are your rights to counsel, to a support person, to an advisor. He meets with the investigator in February. He's interviewed. He gives the names of those witnesses. Now, Mr. Schwartz is going to argue, yes, but we've alleged the investigator never contacted him. We understand what the record is on that. He reviews the draft investigation report, comments on it in April. He's invited to come on May 5th. He's invited to come to a meeting on May 6th to hear the outcome of the investigation. He declines to come. On May 7th, Ms. Goodwin sent him a follow-up letter saying, since you did not, and that's at JA 542, since you did not come, here's what will happen. You've been charged with a violation of the school's sexual misconduct policy. You will, the hearing will be on May 13th and at such and such time. And it also says at that hearing that the SRC is a formal body composed of a combination of five students, faculty, and staff, who are specially trained to hold conferences with all parties and any witnesses in order to review the information presented by the special investigator. So not only is he told in the policy, does the policy allow for him to witness this? In the letter that's sent to him, he's told that the SRC will hear from witnesses. And in that May 7th communication, he sent the correct policy, is that right? He's told and he sent a link to the correct policy. But he'd already been sent that link. I just want to be sure of this because I didn't think you'd got the link until the 7th, but you're telling me he had the link back in January. Right, and not only did he receive the link back in January, but the second page, which is the list of rights and responsibilities. Yeah. What page you're looking for there? It's JA 486. He is specifically told that complaints against students will be reviewed in accordance with the sexual misconduct policy, universities code of sexual conducts, and Appendix A of the policy. It is Appendix A, which are the procedures that govern here. And those are the correct ones? Those are the correct ones. He's told that in January. Did it explain, we sent you the wrong ones two days ago, but we're sending you the correct ones now? This is back in January. He's told this. But I'm talking about May 7th. I'm not... Did it say we sent you the wrong procedures two days ago, but these are the correct ones? I'm not... I know we know now you've received two sets of procedures, one on May 5th, one on May 7th. The May 7th ones are correct. The May 5th ones are wrong. Did you ever tell him that? Not in that letter. But actually he'd received, as I understand your representation, three. He'd received some in the correct in January, the incorrect May 5th, the correct May 7th, with a covering letter of some sort, which talked about... The SRC process, an SRC process, including his right to have witnesses. And there's no allegation. When you review the transcript of the SRC, he clearly knew what was going. He was prepared for the hearing. He had statements from his witnesses. He was prepared. He could argue and did. He had reviewed the police report, including the police statements of Jane Rose, statements to the police. He argued to the SRC why there was inconsistency between those police reports and her statement to Ms. Bronson, Mr. Bronson, and why he thought it was relevant. He had a full and fair opportunity to say there are discrepancies here between what Jane Rose said. But the SRC... You know what that red light means too, don't you? Yes, but I kept to it. I know you do. After it was wrong. They're taking advantage of me. Yeah. Can I ask you one question before you sit down? Yes. Because your time has expired, as Judge King's quite correct. How many of these hearings does the university have a year? Not exact number. Do we... 10 to 12 or so. 10 to 12. And it's, as I understood, this board was a mixture of students and faculty? Faculty and staff. And is it consistent for the year? Or does it change for each? Or do we know? It varies somewhat. But I think the thing to realize is, and the policies address this, is not every claim of sexual misconduct will go to the Standing Review Committee. Well, and I assume the Standing Review Committee isn't just doing sexual misconduct. Couldn't it be dealing with cheating or... No, no, no. This is specific to sexual misconduct. And that's the point. It is a specially trained board. These cases are very sensitive. And they deal with issues that have heightened degree of sensitivity compared to a cheating case, or a vandalism case, or smoking marijuana on campus, or something like that. These are special procedures that are designed for these very sensitive, emotionally traumatic cases for all parties in these types of proceedings. Thank you very much. Thank you, sir. Appreciate it very much. Mrs. Schwartz? Thank you, Your Honors. Just a couple points. JA 185 says, the Title IX officer or designee may request the appearance of persons from the university community who can provide substantial relevant evidence. There is no procedure for the respondent to call witnesses. In fact... Where are you now? JA 185. Well, I read somethings. It was one of these references that you gave me. I think it was in the threes, which does talk about calling witnesses. It says that witnesses, they will hear from witnesses. It is an oblique reference that they can hear from witnesses. But there's nothing that says... Is it your representation that your client tried to bring witnesses in and was not allowed to? It's my representation that my client... Can you answer my question? And then you can tell me yours. The answer is my client asked the Director of Student Conduct to subpoena witnesses. She ignored him and then he did not bring witnesses. That's my representation. And he brought these statements from... And that was under the wrong rules which provide for subpoenas. Okay. Can I ask you something? Or do the... Was the witness's statements... Is it inconsistent with what your testimony would have been? Completely. And I want to read this to you. I just want to be sure you understood my question. Were the statements that his witnesses gave that he presented, would that... Would those statements be inconsistent with the testimony that he wanted them to bring in? His witnesses, his statements... It would have been consistent with his testimony. But I want to read this to you because this is crucial. It's JA-212. The SRC did not find Doe's explanation for entering the room to get some sleep to be credible and gave more weight to the interviews conducted by the police of the occupants of the suite. These interviews alluded to Doe entering on a dare to get into bed with Roe to essentially see how long he could masquerade as KB before Roe realized. That's the police report... But did the statements that were before the SRC that he brought, those are the statements where his witnesses recanted and said, oh, it wasn't a dare. They recanted and they... So the SRC had that to consider? Yes. As well as his testimony? Yes. Well, first of all, he could not... He couldn't testify to what they said. Well, he said he didn't enter it on a dare. He said he didn't enter on a dare, that they might have made some joking reference, but... Or would he have presented then to the committee? Well, he could have... They heard his testimony and he presented the statements as... And in response to Judge Meltzer's question, the statements were what they would have testified to. I think live testimony, Your Honor, would make all the difference in the world. You know, this was... And that's the only difference? Yes. When you consider the statements, the hearsay statements, he had a few days to get something together. And during finals week... So he got notice in January. Let me explain. In January, he got notice of an investigation. The investigation goes through this entire process where they presumably interview witnesses. Then at some point in April, there's a draft report that he gets to look at and make oral comments about. He doesn't get a copy of the draft report. In no time anywhere is there a copy here. He probably could have gotten one had he gone to the meeting he ignored. The meeting says... So the rules say the director of student conduct shall contact the parties to schedule an outcome conference. So on one day, on the 5th of May, he says appear tomorrow at an outcome conference. And he writes her the next day and says, I couldn't appear at this house-owned conference because I had finals. I had group projects. I couldn't go. And so then she writes him the next day, but I want these witnesses. And at that email, she sent him the wrong procedures. It was an attachment. It wasn't a link. She sent the wrong procedures. She wrote, review the code of student conduct, which were the wrong procedures. That's the code of student conduct. He then asks to bring the police to the standing trial. She writes, it's not a trial and there's no procedure for postponement. And then the next day, they send the formal charges the 7th of May, setting up the conference for May 13th. So there's six days during finals week. He says, I want to go to the student aid lawyer. I don't have time. I want to postpone it. There's no procedure for postponement. That's not true. You heard, can I just ask you about, you heard the representations by your colleague on the other side about the, where the record lies on the police investigation of his, his witnesses. Is that a fair characterization? The police interviewed the witnesses at 630 in the morning. They came into the room. They interviewed the witnesses at 630 in the morning. They wrote, there's their recitation in their report. And that's where it appears. It's from the interview at 630 in the morning. And my client said, they asked him, well, why would your client say something different? It's not a question that he can really answer. So you have a gloss on what was said, but, but he's fairly represented what's in the record. Is that right? That, that there was no turn? You just, you heard, weren't you? Yes, the witnesses came. We were all here together, right? Well, I may have missed exactly what he represented, but the witnesses were interviewed at 630 in the morning and their statements appear in the report. That's, that's what's in the record. And you, and your client saw those statements? He saw the police report. That's correct. That's why he brought opposing statements to refute it. That's, that's, that's correct. But what I'm saying to you is that having a live testimony... I'm sorry. The other piece of this that was represented to us was that there had been an effort to get a hold of your witnesses. And the, the investigator or somebody said that he tried to get a hold of those witnesses. The witnesses say they didn't, but they have filed an affidavit saying that they did. And my witnesses... That's the way the record lies, right? And there's an affidavit from my, there's also a counter affidavit from my witnesses saying, no, they never contacted us. Here's a copy of my inbox. We never received these emails. Were these affidavits or statements? Affidavits in this case, part of the record. So there's affidavits and counter affidavits as to that. It's a factual dispute as to whether or not they were contacted by the investigator. It is, it is an issue. There's counter affidavits refuting each other. It's, I don't want to make this into a summary judgment case because it's not, but they raised it by affidavit. So there's a counter affidavit filed. But let me just say... And that was all in front of the district court. It was all in front of... And it was all in front of the board. She decided not to deal with it. She basically said... And that red light's back on. I'm asking the questions. I wanted to... So that was all in front of the district court. This all happened before... This all was in front of the district court. The affidavits and the counter affidavits. I just wanted to say a couple... But Judge King is quite right. Your time is up too. So you should be summing up. Well, I've been trying, but if I could just... Let me just say one thing to you. You should be interested in what we want to know because we're the ones that are going to decide the case. And I am. So just saying I'm trying to do it, you know? If I could just say one thing. In summary, in summary, Matthews versus Eldridge says, and there was no Matthews versus Eldridge analysis in this case, says that first, we have to take the private interest affected by the official action. Obviously, that is in favor of the student. Second, the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. And finally, the government's interest, including the function involved in the fiscal administrative burdens that the additional or substitute procedural requirements will entail. Well, Catherine Carroll, the director of the Title IX office, who built this house, who wrote these procedures, says the new policy... I thought you said this was going to be in summary. Yeah, this is it. She says... You're still taking advantage of me. That red light's been on a long time. She just says there are no safeguards. Judge Motz didn't ask you what Matthews versus Eldridge said. We're familiar with Matthews versus Eldridge. We actually have heard of Matthews versus Eldridge. But she says there are no procedural safeguards. I want to tell the students that one of the grand traditions of the Fourth Circuit is that after each oral argument, we, the members of the panel, come down and greet counsel. And then we return to the bench and we call the next case. That's what we're going to do right now.
judges: Diana Gribbon Motz, Robert B. King, Stephanie D. Thacker